867 So.2d 1136 (2003)
K.D.T.J.
v.
MADISON COUNTY DEPARTMENT OF HUMAN RESOURCES.
Madison County Department of Human Resources
v.
In re the Matter of W.Z.K.T.
2020033.
Court of Civil Appeals of Alabama.
May 23, 2003.
Rehearing Denied July 11, 2003.
*1137 David E. Worley, Huntsville, for appellant K.D.T.J.
William H. Pryor, Jr., atty. gen., and J. Coleman Campbell, deputy atty. gen., and Lynn S. Merrill, asst. atty. gen., Department of Human Resources, for appellee/cross-appellant Madison County Department of Human Resources.
PER CURIAM.
On October 11, 2001, the Madison County Department of Human Resources ("DHR") filed a petition seeking to terminate the parental rights of K.D.T.J. ("the mother") and E.B.C. ("the father") to W.Z.K.T. ("the child"). On July 1, 2002, and August 30, 2002, the trial court held a final hearing and received ore tenus evidence. On September 27, 2002, the trial court entered an order terminating the mother's parental rights and denying DHR's request to terminate the father's parental rights. DHR filed a postjudgment motion on October 9, 2002, which the trial court subsequently denied. The mother appealed and DHR cross-appealed.
At the time of the hearing, the mother and the father were both 21 years old, and the child was 3 years old. DHR had assumed custody of the child when the child was 11 months old. DHR assumed custody after the mother took the child to the Huntsville Hospital with cold symptoms and chest X-rays revealed that the child had previously suffered a fractured collarbone that had already healed. The child was taken from the mother's custody in March 2000 and, following a shelter-care hearing on March 9, 2000, the child was placed in DHR's protective custody. The child had been in the custody of DHR for 26 months as of the time of the hearing in this matter.
The mother and the father were never married. The mother had dated the father in high school for two to three weeks, during which time the parties had a short-lived sexual relationship, and the mother subsequently became pregnant. The father testified that the mother had informed him of her pregnancy but had not stated that he was the unborn child's father. According to the father, he did not believe that he was the father of the child because the mother had been sexually involved with several other men around the time he was intimate with the mother. The father acknowledged that he believed he could be the father of the child and that *1138 he had reached an agreement with the mother to take a paternity test; however, the father subsequently lost contact with the mother, and the test never took place. The father testified that the mother did not contact him after the child was born in April 1999. According to the mother, the father never contacted her concerning the child before the child was placed in the protective custody of DHR; the mother did not receive financial assistance for the benefit of the child from the father.
Stephanie Taymon, a social worker for DHR, first contacted the father by telephone in February 2001 to inform him of his potential paternity of the child; the father did not object to taking a paternity test. On or about July 19, 2001, the father received a letter from Taymon noting their prior conversation and informing him that she submitted his information "to the [DHR] attorneys." In November 2001, the father submitted to a paternity test, and in January 2002, the test results indicated that he was the father of the child. Taymon testified that, at the time the father submitted to the paternity test, DHR had already made the decision to seek the termination of the father's parental rights. According to Taymon, the decision was based, in part, on the length of time the child had been in DHR's care and on the apparent lack of interest the father had initially shown in becoming a party to the child's case. The father testified that the slow pace of the paternity testing and the slow receipt of the results hindered his ability to visit the child because DHR would not schedule visitation times until the paternity-test results were returned.
Before receiving the paternity-test results, the father informed Taymon that he wanted to relinquish his parental rights to the child. Taymon testified that the father was initially concerned about removing the child from the care of the foster parents and about whether he was financially capable of caring for the child. The father testified that, after discussing the situation with his wife and his parents, he decided to pursue custody of the child. Soon thereafter, the father requested visitation with the child; the father first began visiting the child on February 13, 2002. The father receives one hour of supervised visitation weekly, which he regularly attends and has never missed. The father testified that he requested additional visitation but that his request was denied.
The father is married to L.C., who was 26 years old at the time of the hearing; the father and L.C. have been married for approximately four years. No children have been born of that marriage. The father works for his father's towing company as a supervisor and tow-truck driver. The father testified that he earns approximately $300 to $600 per week. L.C. also works for the towing company as a dispatcher; the father and L.C. have a combined monthly income of between $2,600 and $3,000. L.C. testified that she had been previously employed at a day-care center and that she is comfortable caring for small children. L.C. stated that she intends to return to that type of employment.
The father has no adult arrest record; L.C. has no arrest record. The father and L.C. are in good health. The father suffered from Attention Deficit Hyperactivity Disorder ("ADHD") as a young man, but he stated he no longer experiences problems with his ADHD.
The father and L.C. live in a two-bedroom house. Carolyn Nixon, a DHR employee who completed two home evaluations of the father and L.C., testified that the couple's home was adequately furnished and clean. Nixon observed that the father and L.C. had purchased toys for the child and had made safety improvements *1139 in the backyard in the event the child is placed with the couple. According to Nixon, the father's family members and references are supportive of the father's attempt to gain custody of the child. Nixon testified that she had concerns about placing the child in the father's custody because he did not confront the likelihood that he was the father of the child until contacted by DHR, even when the father knew that the child could be his.
The mother is married to J.J., who was 29 years old at the time of the hearing in this matter; the mother and J.J. have been married for approximately two years. The mother began dating J.J. when she was pregnant with the child and married J.J. after the child's birth. One child, C.J., has been born of that marriage; C.J. was 15 months old at the time of the hearing in this matter. The mother was five months pregnant with a third child when the termination hearing took place.
At the time of the hearing, the mother had four felony charges pending against her. On or about December 7, 1999, following a search of the mother's residence, the mother was charged with two counts of possession of a controlled substance, one count of possession of cocaine, and one count of possession of marijuana. The child was nine months old when the mother was arrested. Testimony revealed that the illegal drugs were seized from the master bedroom, the kitchen, and from under the child's crib. The mother was scheduled to go to trial on the felony charges in September 2002. J.J. was also charged with committing the same felonies as the mother and was also arrested. The mother denies any involvement with the drugs seized and claims she was arrested because she resides in the residence where the drugs were seized. The mother testified that she had used marijuana a couple of times in her youth but that she no longer uses the drug; drug screenings administered to the mother were negative. The mother stated that she anticipates that she will receive probation for her drug charges but that she is unsure whether J.J. will receive probation or will be sentenced to jail for the drug charges pending against him.
J.J. has a history of drug abuse beginning when he was 13 years old. J.J. completed a 28-week drug-treatment program with New Horizons, and, at the time of the termination hearing, he was in an intensive aftercare drug-treatment program. In addition to his arrest on drug charges, J.J. has been arrested twice for instances involving domestic violence. The mother admitted that she and J.J. have had problems in the past with domestic violence, but she denied J.J. had ever hit her. J.J. completed a domestic-violence program at the Family Services Center, and the charges against him were subsequently dismissed.
The mother and J.J. currently live in Tennessee and have no plans to return to Alabama. The mother testified that she is unemployed and stays home with her daughter, C.J. J.J. works in construction and earns approximately $250 to $500 per week. The mother has no significant work history, and the court report submitted by DHR reveals that J.J. has had an "erratic" employment history.
During the course of DHR's involvement with the mother and J.J., the couple moved numerous times. Nixon performed two home evaluations on the mother and J.J. in Tennessee. In the first evaluation, performed in July 2001, Nixon noted that the couple lived in a small, two-bedroom mobile home that was not in good condition and in which the ceiling in the child's room was "falling in." The mother and J.J. moved twice following the first evaluation. At the time of the hearing, the mother and *1140 J.J. resided in a three-bedroom mobile home that, Nixon testified, was in good condition, was clean, and was adequately furnished. Nixon completed her final home evaluation of the mother and J.J. on May 24, 2002. Nixon testified that, after completing the home evaluations, she had concerns about placing the child back in the mother's custody. According to Nixon, those concerns involved the instances of domestic violence, the pending drug charges, and the couple's financial situation.
The mother testified that she was recently diagnosed with cervical cancer. The mother has a heart murmur and has gestational diabetes. J.J. also has a heart murmur, but is otherwise in good health. The mother testified that she is seeking treatment for her cancer and that her heart murmur does not present any medical problems.
Since becoming involved with the child, DHR has offered numerous services to the mother and J.J. The services provided by DHR include random drug screenings, assessments and treatment at New Horizons, transportation to visits with the child, drug treatment for J.J., psychological evaluations, and parenting and counseling services. According to Taymon, the mother and J.J. have not received the parenting and counseling services provided by DHR since the couple moved to Tennessee.[1] Taymon testified that she is concerned about the mother and J.J.'s history of domestic violence and the criminal charges pending against the couple. Taymon also has concerns about the mother's parenting skills. Nixon noted her concerns regarding the mother's interaction with her second child, C.J.; while evaluating the mother's home, Nixon observed that the mother was unresponsive to C.J. Taymon stated that, in the 26 months DHR had had custody of the child, she had never recommended that the child be returned to the mother's care.
DHR only recommended and provided a psychological evaluation to the father; no other services were offered or deemed necessary. The psychological-evaluation report states that there is no psychological reason why the father "would not be able to maintain custody and function appropriately as a parent." DHR evaluated several other potential family placements for the child; none of those potential placements were deemed acceptable. In her court report, Taymon notes that, with the exception of the father, there are no relative resources that are able, or willing, to provide long-term placement for the child.
In its judgment, the trial court terminated the parental rights of the mother and denied the petition to terminate the parental rights of the father. The court specifically found that the father had not abandoned the child. In so finding, the trial court stated:
"The evidence presented in this case was the father attended every (ALL) scheduled visits since paternity was determined and he appears to have complied with all requests of DHR regarding this child. The evidence clearly indicates that should rehabilitation have been necessary with the father, no attempts were made as is required before a parent's rights can be terminated. The Court is aware that the father made no efforts to exercise his parental duties before DNA testing, and before he was contacted by DHR. He and his family appear to have questioned paternity following the birth *1141 of the child, and the request for genetic testing was clearly his option. This Court is unable to find that `no viable alternative to termination exists.'"
Section 26-18-7, Ala.Code 1975, which sets forth the statutory authority for the termination of a parent's parental rights, provides, in pertinent part:
"(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
"(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
"(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for [the] needs of the child.
"(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
"(4) Conviction of and imprisonment for a felony.
"(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
"(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
"(7) That the parent has been convicted by a court of competent jurisdiction of any of the following:
"....
"(8) That parental rights to a sibling of the child have been involuntarily terminated.
"(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
"(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
"(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
"(3) Failure by the parents to maintain consistent contact or communication with the child.
"(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including *1142 agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."
(Emphasis added.)
This court has stated that:
"Every parent has a prima facie right to custody of his or her child and that right can only be overcome by a showing of clear and convincing evidence that removing the child from the parent's custody would be in the best interests of the child. M.H.S. v. State Dep't of Human Resources, 636 So.2d 419 (Ala.Civ. App.1994).
"`The trial court is given the authority to terminate parental rights if it finds from clear and convincing evidence that the parents are unable or unwilling to discharge their responsibilities to and for the children. § 26-18-7, Ala.Code 1975. The trial court shall consider whether the parents have abandoned their children, whether the parents have problems with drugs or alcohol, and whether reasonable efforts to rehabilitate the parents have failed. § 26-18-7(a), Ala.Code 1975. If the children are not in the physical custody of their parent or parents, the trial court shall also consider such circumstances as whether the parents have provided material needs for the children, whether the parents have maintained regular, scheduled visits with the children, and whether the parents have adjusted their circumstances to meet the needs of the children according to agreements reached administratively or judicially. § 26-18-7(b), Ala.Code 1975.'

"M.H.S. v. State Dep't of Human Resources, 636 So.2d at 421.
"Where a nonparent petitions to terminate a parent's parental rights, the trial court must apply a two-pronged test. Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990). The trial court must first determine that the child is dependent. Id. After finding the child dependent, the court must examine viable alternatives to the termination of parental rights. Id. On appeal, the trial court's determination is presumed to be correct, and it will not be reversed absent a showing that the decision is so unsupported by the evidence as to be plainly and palpably wrong. M.H.S. v. State Dep't of Human Resources, supra. In a proceeding to terminate parental rights, the paramount consideration of the trial court, and of this court, is the best interests of the children involved. Id."

A.R.E. v. E.S.W., 702 So.2d 138, 139-40 (Ala.Civ.App.1997).
On appeal, the mother argues that the trial court erred in finding the child dependent and in terminating her parental rights. A determination of dependency is within the sound discretion of the trial court and will not be disturbed on appeal unless it is so contrary to the evidence as to be plainly and palpably wrong. In re T.M.A., 590 So.2d 298 (Ala.Civ.App. 1991). The evidence indicates that the child was taken to the hospital where a chest X-ray revealed a previously broken collarbone. The mother offered no explanation for how the child suffered that injury. Four months before taking the child to the hospital, the mother was arrested on two counts of possession of a controlled substance, one count of possession of marijuana, and one count of possession of cocaine. Drugs were seized from under the child's crib. Given the child's unexplained injury, coupled with the pending drug charges against the mother and her husband, we cannot say the that trial court abused its discretion in finding the child *1143 dependent and placing the child in the protective custody of DHR.
After finding the child dependent and placing the child in protective custody, the trial court determined there were no viable alternatives and terminated the mother's parental rights. The record reveals that the mother is unemployed and that her husband, J.J., is employed in construction and earns approximately $250 to $500 per week. The mother has no significant work history. The mother and J.J. have one child together and are expecting a second child. The mother testified that she was recently diagnosed with cervical cancer.
In addition to the mother's financial and health problems, the mother and J.J. have criminal charges pending against them. Although the mother believes that she will receive probation, there is no guarantee that she will not serve time in prison; it is also unclear whether J.J., the sole income producer for the family, will be sentenced to imprisonment. J.J. also has a history of committing domestic violence. The mother admitted that she and J.J. have had problems in the past with domestic violence.
Taymon and Nixon both testified that they had concerns regarding the mother's parenting skills. Nixon testified that the mother did not interact with the child and that the mother was not responsive to the child. Taymon testified that DHR had recommended that the mother and J.J. attend parenting classes. The mother attended the Today's Mom Program from August 29, 2000, until October 3, 2000; at that time, the mother was pregnant with C.J. According to Taymon, the class dealt primarily with nutrition in infants but did not address all the dynamics of parenting toddlers and older children. Taymon testified that the mother needed to attend additional parenting-skills classes. Taymon testified that, after the mother and J.J. moved from Alabama to Tennessee, they did not attend any parenting classes made available to them through DHR and the Tennessee Department of Children's Services.
It is well settled that a child's parents have a prima facie right to custody; however, the paramount concern in termination-of-parental-rights proceedings is the best interests of the child. J.L.B. v. State Dep't of Human Res., 608 So.2d 1367 (Ala.Civ.App.1992); and Mitchell v. State Dep't of Human Res., 513 So.2d 647 (Ala. Civ.App.1987). When determining the child's best interests, the trial court must examine whether the parents are physically, financially, and mentally able to provide for the child. Mitchell, supra. The mother is facing uncertain health problems. The mother and J.J. have no income other than the fluctuating income J.J. receives from employment that changes with some frequency. It is clear from the evidence presented at the hearing in this matter that the child's interests would best be served in the care, custody, and control of someone other than the mother and J.J. Given the facts of this case and the presumption of correctness this court must afford the trial court's decision to terminate a parent's parental rights, see M.H.S. v. State Department of Human Resources, 636 So.2d 419 (Ala.Civ.App.1994), we cannot say that the trial court's decision to terminate the mother's parental rights was so unsupported by the evidence in the record as to be plainly and palpably wrong.
DHR contends in its cross-appeal that the trial court erred in failing to terminate the father's parental rights because, it contends, the father abandoned the child. In support of its contention that the father abandoned the child, DHR focuses on the father's inaction prior to being *1144 initially contacted by DHR regarding his status as the putative father of the child. DHR further asserts that placing the child in the father's custody is not a viable alternative and is not in the child's best interests.
Section 26-18-3(1), Ala.Code 1975, defines "abandonment" as "[a] voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from a child, without good cause or excuse, by the parent, of his presence, care, love, protection, maintenance or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or the failure to perform the duties of a parent." Abandonment implies an intentional act on the part of the parent. § 26-18-3(1), Ala.Code 1975.
The father testified that the mother had told him that she was pregnant but that he believed that, during the time he was intimate with the mother, she was also intimate with several other men. According to the father, he and the mother were only intimate a couple of times during a two to three week period. The father stated that he had known it was a possibility that the child was his and that he had agreed with the mother to take a paternity test once the child was born; however, the father testified that he lost contact with the mother and was never able to take a paternity test. DHR contacted the father in February 2001. At the time DHR contacted the father, the child had been in DHR's custody for 11 months and was 22 months old. Nine months after the father agreed to a paternity test, DHR received a court order and the father was able to take the test. In January 2002, the results revealed that the child and the father were a genetic match, and the father immediately asked for visitation with the child. The father admitted that he originally wanted to relinquish his parental rights but that shortly thereafter he decided to pursue custody. The father testified that DHR denied his requests for visitation with the child until the paternity results were returned. The record indicates that the father sought and received visitation rights with the child after paternity was established and that the father exercised visitation with the child consistently after he was granted visitation.
We are not persuaded by DHR's argument that the father was not a viable placement alternative for the child and that placement with the father was not in the child's best interests. The father and L.C. have been married for four years, are both employed, and are both in good health. The father and L.C. collectively earn an income between $2,600 and $3,000 per month. The father and L.C. share a small, two-bedroom home that is adequately furnished. As Nixon noted and testified at the hearing, the father and L.C. had made safety improvements to their backyard in preparation for the child. L.C. has a background in caring for small children in day-care programs. The father's psychological evaluation revealed no reason why the father "would not be able to maintain custody and function appropriately as a parent." In addition, Taymon testified that, with the exception of the father, there were no relative resources available or willing to provide long-term placement for the child. Given the evidence that the father is physically, financially, and mentally capable of providing for the child, we cannot say that the trial court erred in denying DHR's request to terminate the father's parental rights. See Mitchell, supra.
APPEALAFFIRMED; CROSS-APPEALAFFIRMED.
YATES, P.J., and CRAWLEY, THOMPSON, and PITTMAN, JJ., concur.
MURDOCK, J., concurs in part and dissents in part.
*1145 MURDOCK, Judge, concurring in part and dissenting in part.
I am concerned about the manner in which this and other courts of this state are in many cases construing and applying the presumption in favor of biological parents. In my opinion, we are in many cases defeating the supposed goal of finding the result that is in the best interests of the children in those cases. I believe this is such a case.
The presumption in favor of a biological parent is a strong one, as well it should be. Ultimately, however, it is only a presumption or a "prima facie right"; it can be overcome by clear and convincing evidence of unfitness or of voluntary relinquishment.
Section 26-18-7, Ala.Code 1975, provides the following statutory authority for the termination of parental rights:
"(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
"(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
"....
"(c) In any case where the parents have abandoned a child and such abandonment continues for a period of four months next preceding the filing of the petition, such facts shall constitute a rebuttable presumption that the parents are unable or unwilling to act as parents. Nothing in this subsection is intended to prevent the filing of a petition in an abandonment case prior to the end of the four-month period."
The child in this case was born in April 1999. The father testified that, following a sexual relationship between the father and the mother, the mother informed him that she was pregnant. He further testified that he knew that there was a "strong possibility" that he was the father of the child. Indeed, according to the father, in December 1998, when the mother was approximately five months' pregnant, he and the mother agreed that he would take a paternity test when the child was born. While the father testified that he thereafter "lost contact" with the mother, the record contains no indication that the mother permanently changed her residence or that the father ever made any effort to "contact" the mother.[2] The record *1146 also contains no evidence that, prior to the birth of the child in April 1999, the father offered any financial or emotional support to the mother. Nor did the father file a notice in the Putative Father Registry pursuant to Ala.Code 1975, § 26-10C-1.
In March 2000, when the child was 11 months old, DHR took the child into protective custody. During the 11 months after the birth of the child and before DHR took custody of the child, the father made no effort to contact the mother and took no initiative to determine if he was the biological father of the child; he had no involvement with the child or the mother.
In February 2001, the child turned 22 months of age. Between the time DHR took the child into custody and February 2001, a period of 11 months, the father still made no effort to contact the mother. He likewise took no initiative to determine whether he was in fact the father of the child; he continued to have no involvement with the child, or with the mother or DHR.
In February 2001, however, a social worker for DHR contacted the father by telephone and advised him of that which the father was already aware, namely, his potential paternity of the child. In October 2001, after another eight-month period without any initiative on the part of the father to request a paternity test, and no involvement by the father with either the mother or the child, DHR made the decision to file for the termination of the father's parental rights. That decision was based, in part, on the length of the time the child had been in DHR's care and the apparent lack of interest the father had shown in becoming a party to the case. By this time, the child was approximately two and one-half years old; the child had never seen the father; the father had never seen the child; the father had provided no support of any nature for the child or the mother. Further, while the father acquiesced to a paternity test in November 2001, before receiving the results of that test, the father informed the DHR social worker that he wanted to relinquish his parental rights to the child. Among other things, the DHR social worker testified that the father was initially concerned about removing the child from the foster parents with whom the child had been living.
While the father has no adult arrest record, he has only recently become an adult. The father has an extensive juvenile arrest record. In addition, the court-appointed juvenile advocate ("CAJA") reported to the court that the father had been abused by his father (the paternal grandfather).
A DHR representative testified that she had concerns about placing the child in the father's custody because he did not confront the likelihood that he was the father of the child until contacted by DHR, even when the father knew the child could be his. The CAJA reported to the court that she absolutely had concerns about the child being placed with the father, noting among other things that she had observed a lack of sensitivity toward the child from both the father and his wife, as well as a lack of maturity, stability, and responsibility needed to care for the child. She recommended *1147 termination of the father's parental rights.
DHR argues that the father's explanation of why he did not claim his rights as a parent of the child for almost three years did not provide good cause for that failure and that the father, by his inaction, abandoned the child. I agree.
The child in this case was placed in foster care on March 9, 2000. By the time DHR filed its petition to terminate parental rights, the child had been in foster care well over 15 of the previous 22 months. As DHR points out, Ala.Code 1975, § 26-18-5(b), provides:
"In the case of a child who has been in foster care under the responsibility of the department for 15 of the most recent 22 months, or, if a child has been abandoned... the department shall file a petition to terminate the parental rights of the parents...."
In addition, the CAJA and the guardian ad litem in this case both were of the opinion that it was not in the child's best interests to be taken away from the foster family with whom the child had lived for most of the time since March 2000. The child had lived in the home of this foster family for the 18 months preceding the termination hearing; for the 9 months before that, the child had been in the custody of the foster parents for approximately 3 months and had enjoyed extensive visitation with the foster parents for approximately 6 months. The CAJA's report contained what DHR argues is a "compelling appendix" regarding the issue of "attachment" and the consequence of a child losing a succession of mother figures. In this case, the child had foster parents who loved and cared for him and with whom the undisputed evidence indicates he had bonded. The CAJA reported to the court that the child considered the foster parents to be his parents.
While there may be differences between an adoption case and a termination case based on statutory provisions that expressly provide that certain acts on the part of a father constitute an implied consent to an adoption, see Ala.Code 1975, § 26-10A-9, obviously, any case involving the adoption of a child necessarily entails the termination of the biological parents' rights to that child. It is therefore noteworthy that this court has spoken clearly and forcefully to certain fundamental principles that justify the termination of parental rights in an adoption case where a parent has not stepped forward to assume responsibility for his or her child. In M.V.S. v. V.M.D., 776 So.2d 142 (Ala.Civ.App.1999), although there were some actions on the part of the father suggesting a more active rejection of the child than were presented in the case now before us, this court primarily had before it a case in which the father of a child born out of wedlock had failed to step forward and demonstrate any interest or significant involvement with the child prior to his birth and for a period of 10 months after his birth (in contrast to the time period in the present case). Quoting from the United States Supreme Court in Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), this court stated:
"`When an unwed father demonstrates a full commitment to the responsibilities of parenthood by "com[ing] forward to participate in the rearing of his child," Caban [v. Mohammed], 441 U.S. [380] at 392[, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979)], his interest in personal contact with his child acquires substantial protection under the Due Process Clause.... But the mere existence of a biological link does not merit equivalent constitutional protection.'
"463 U.S. at 261, 103 S.Ct. 2985.
*1148 "`The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie.'
"463 U.S. at 262, 103 S.Ct. 2985."
776 So.2d at 145-46. This court then concluded that:

"Lehr made it clear that a biological link with the child does not automatically give the natural father a constitutional right to withhold consent to an adoption. Instead, the natural father must have established a substantial relationship with the child to merit constitutional protection."
776 So.2d at 146.
More recently, this court analyzed the holding of the Supreme Court in Lehr in conjunction with the holdings of our Supreme Court in such custody cases as Ex parte Terry, 494 So.2d 628 (Ala.1986); Ex parte McLendon, 455 So.2d 863 (Ala.1984); and Ex parte Berryhill, 410 So.2d 416 (Ala.1982). See R.K. v. R.J., 843 So.2d 774 (Ala.Civ.App.2002) (recognizing the relative importance of stability in a child's environment and in the child's relationships with those who have cared for and loved the child in comparison to a child's biological ties with a natural parent when the latter has made himself a stranger to the child). Among other things, this court stated in R.K.:
"Accordingly, the United States Supreme Court recognized in Lehr [v. Robertson, 463 U.S. 248 (1983),] that'" [p]arental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring."` Lehr, 463 U.S. at 260, 103 S.Ct. 2985 (quoting Caban v. Mohammed, 441 U.S. 380, 397, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979)). As the Lehr Court noted,
"`Commentators have emphasized the constitutional importance of the distinction between an inchoate and a fully developed relationship. See Comment, 46 Brooklyn L.Rev. 95, 115-116 (1979) ("the unwed father's interest springs not from his biological tie with his illegitimate child, but rather, from the relationship he has established with and the responsibility he has shouldered for his child"); Note, 58 Neb.L.Rev. 610, 617 (1979) ("a putative father's failure to show a substantial interest in his child's welfare and to employ methods provided by state law for solidifying his parental rights ... will remove from him the full constitutional protection afforded the parental rights of other classes of parents"); Note, 29 Emory L.J. 833, 854 (1980) ("an unwed father's rights in his child do not spring solely from the biological fact of his parentage, but rather from his willingness to admit his paternity and express some tangible interest in the child").'

"Lehr, 463 U.S. at 261, n. 17, 103 S.Ct. 2985. The Court therefore further recognized that an unwed father's demonstration of commitment to his child is determinative of his due-process rights:
"`When an unwed, father demonstrates a full commitment to the responsibilities of parenthood by "com[ing] forward to participate in the rearing of his child," Caban [v. *1149 Mohammed], 441 U.S. [380,] 392 [(1979)], his interest in personal contact with his child acquires substantial protection under the Due Process Clause. At that point it may be said that he "act[s] as a father toward his children." Id., at 389, n. 7, 99 S.Ct. 1760. But the mere existence of a biological link does not merit equivalent constitutional protection. The actions of judges neither create nor sever genetic bonds. "[T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in `promot[ing] a way of life' through the instruction of children ... as well as from the fact of blood relationship." Smith v. Organization of Foster Families for Equality and Reform, 431 U.S. 816, 844, 97 S.Ct. 2094, 2109-2110, 53 L.Ed.2d 14 (1977) (quoting Wisconsin v. Yoder, 406 U.S. 205, 231-233 (1972)).'"
R.K., 843 So.2d at 781.
Thus, the constitutional concerns that are likewise reflected in our state-law presumption favoring biological parents are not even raised in the first instance where a father has not stepped forward to assume responsibility for and involvement in the life of his child. In the present case, the record clearly demonstrates that the father made no effort and took no initiative to locate the mother, to determine the status of the child, and/or to obtain a paternity test. There is no evidence that he provided emotional or financial support to the mother prior to the birth of the child. For over two and one-half years after the child's birth, he took no initiative of his own to determine whether he was the father of the child, either through self-help or through the help of a court. In short, he showed no interest in the child or even in finding out if the child was his, despite knowing that there was a "strong possibility" that he was the father. In part because the father had not stepped forward to be a parent to this child, the child was placed by DHR in foster care and, over a period of approximately two years, bonded with loving foster parents whom the child considers to be his mother and father according to the testimony of one witness.
While there is and should be a strong policy presumption favoring the right of a parent to the custody of his or her child, the fundamental principles that inform that presumption and that should be guiding our decisions in this area do not support the extension of that presumption in a case such as this to a father whose only connection with the child is a purely biological one. If we are serious about pursuing the best interests of the children in such cases, I believe we must recognize both the legal and practical effect of a biological father who allows himself to become a stranger to his offspring. See generally Lehr v. Robertson and R.K. See also Ex parte W.T.M., 851 So.2d 55 (Ala. Civ.App.2001) (Murdock, J., dissenting). Cf. § 26-10A-9(a)(1) (recognizing that a father's abandonment of a child may imply a "relinquishment for adoption to the Department of Human Resources" under § 26-10A-7(a)(5)); § 26-10A-9(a)(5) (recognizing that failure to comply with the Putative Father Registry Act may imply a "relinquishment for adoption to the Department of Human Resources" under § 26-10A-7(a)(5)); § 26-10A-7(a)(5) (providing, among other things, that "relinquishment for adoption to the Department of Human Resources" is not required of a putative father who has failed to file an appropriate notice in the Putative Father Registry (cross-referencing § 26-10C-1));
*1150 § 26-10C-1(i) (providing that any person who claims to be a biological father of a child and who fails to file his notice of intent to claim paternity pursuant to § 26-10C-1(a) within 30 days of the birth of a child born out of wedlock shall be deemed to have given an irrevocable implied consent in any adoption proceeding).
Based on the foregoing, I respectfully dissent with respect to that part of the main opinion affirming the trial court's decision not to terminate the father's parental rights. I concur as to the termination of the mother's parental rights.
NOTES
[1] DHR referred the mother and J.J. to the Tennessee Department of Children's Services for parenting classes and counseling services; however, Taymon testified that the mother chose not to obtain those services.
[2] The father also testified that he knew the mother lived with her mother (the maternal grandmother):

"Q: You knew where she lives; right?
"A. I knew she lived with her Momma, but she was in and out of her Momma's house, so
"Q. Okay. Did you go by her Momma's house, to say `Hey, did the baby come?'
"A. No, sir. Like I said, we was talking tome and her talked about having a paternity test, so, therefore, I figured she would have got in contact with me when the baby was born.
"Q. Right. But you never followed up on that?
"A. I didn't know where she was.
"Q. Right. But the question is you never followed up on getting that paternity test?
"A. No, sir.
"Q. And, in fact, during this period of time, [the mother] had made several attempts to contact you and tell you about her pregnancy; hadn't she?
"A. She might have. I never did."