MURDOCK, Judge,
dissenting.
The child in this case, a girl, was born in April 1996. Before her birth, the child’s biological father made no attempt to support K.H.M., the child’s mother, either emotionally or financially. For several years following the child’s birth, the biological father showed no interest in, and took no steps toward, being involved in the child’s life.
The mother testified that when the child was seven months old she requested that the father pay child support but that he refused. The mother then sued the father to establish his paternity of the child and to force child-support payments, an effort in which she was successful.
When the child was eight months old, the mother and R.M. began dating. The mother and R.M. married in October 1997 and, based on the evidence presented, it appears that R.M. has since that time been a good and loving stepfather to the child.
For the next four and one-half years, the court automatically deducted from the father’s paycheck the child support that he had been ordered to pay. However, during this time (and therefore for a total of five and one-half years from the child’s birth), the father made essentially no effort whatsoever to see his child or to become involved in her life in any way. In short, the child has, for almost all of her first six years of life, grown up knowing R.M. as her father and knowing of no other man as her father. Accordingly, when the child was five and one-half years old, R.M. and the mother approached the biological father to ask if he would consent to R.M.’s adopting the child as his own. In response, the biological father filed a custody petition in an attempt to obtain custody of a child whom he had never seen.
The father’s admissions at trial prove his complete abandonment[1] of the child to the *958 care of the mother and R.M. for several years.
“Q. You saw your child for the first time at the child support hearing; is that correct?
“A. Yes.
“Q. The testimony has been in essence that you made no efforts whatsoever to actually see or visit your child from the time that you found out that you were the child’s father, at least through the year 1997; isn’t that true?
“A. That would be true.
“Q. And you have made no effort in the year 1997 after you found out that you were the child’s father to go see her, true?
“A. Up until '99.
“Q. Okay, the answer to my question was yes, I made no efforts in '97?
“A. Correct.
“Q. And the same is true of 1998, you made no efforts to see your child in '98?
“A. Not to my knowledge.
“Q. When do you claim that you tried to see the child in '99?
“A. Well, I would call [K.H.M.’s] sister at work, and ask here to give [K.H.M.] a call to see if she would call me back. Sometimes she would, sometimes she wouldn’t. ■
“Q. Okay. You say you made efforts in '99 to call [KH.M.’s] sister; is that right?
“A. Correct.
“Q. And your conversations were one minute each and those were the minutes where you didn’t actually talk to her; what did you do, leave a message?
“A. Or just hang up without leaving a message.
“Q. Apparently you had five minute conversation with her [the sister] in January of 2000?
“A. Yes.
“Q. You never once called [K.H.M.] ... to ask [for] visitation in the year 2000, did you?
“A. No only — .
“Q. The question is, isn’t [it] true you never once called [K.H.M.] to see about visiting with [the child], in the year 2000?
“A. No, I guess I never did call [K.H.M.]
“Q. You never went to [K.H.M.’s] mother’s house to try to arrange for visitation at any time ever, even to today?
“A. No, sir.
“Q. Now, did you ever send [the child] a Christmas present?
“A. This past Christmas, yes.
“Q. After you filed for custody, right?
“A. Yes.
“Q. Yeah. How about before your lawyer filed something, did you ever send [the child] a Christmas present?
“A. No, sir.
“Q. Did you ever send [the child] a birthday present?
“A. No, sir.
“Q. Did you ever call [the child] on her birthday or Christmas?
“A. No, sir, I never had a phone number or address to send her anything.
“Q. You knew [K.H.M. and the child were] living with [K.H.M.’s] mother after you moved out, didn’t you?
*959 “A. Yes.
“Q. And you knew at any time you could have gone to [KH.M.’s] mom’s and found out where [K.H.M. and the child were], didn’t you?
“A. I never knew how long [K.H.M.] lived there with her mother.
“Q. You never made no effort to find out, did you?
“A. No, sir.
“Q. So the truth of the matter is, you never made even the smallest effort, aside from calling [K.H.M.’s] sister a few times, to try to find out about your daughter; that’s the truth, isn’t it?
“A. I guess so.”
In sum, it is clear from the record that from the period of the child’s birth through the summer of 2001, a period of five and one-half years, the biological father never once sought to see his child.
This case raises two significant issues that, in my opinion, require the reversal of the trial court’s judgment. Those two issues correspond to the two-pronged test articulated in Ex parte Beasley, 564 So.2d 950 (Ala.1990), that is applicable in any termination-of-parental-rights case: (1) determining whether there are “grounds for the termination,” and (2) determining whether, after considering the viable alternatives, termination is in the best interests of the child. Ex parte Beasley, 564 So.2d at 954-55. See D.M.P. v. State Dep’t of Human Res., 871 So.2d 77 (Ala.Civ.App.2003) (plurality opinion).
The first issue is whether a biological father with no other connection with his child, who is ordered by a court to pay child support as a result of a paternity action filed against him by the child’s mother, and whose paycheck is garnished for that support, can be found to have abandoned the child. Section 26-18-3(1), Ala.Code 1975, part of the Child Protection Act, provides the following statutory definition of “abandonment”:
“[ (1) ] A voluntary and intentional relinquishment of the custody of a child by a parent, or [ (2) ] a withholding from the child, without good cause or excuse, by the parent, of his presence, care, love, protection, maintenance or the opportunity for the display of filial affection, or [ (3) ] the failure to claim the rights of a parent, or [ (4) ] failure to perform the duties of a parent.”
(Section 26-10A-2(1), Ala.Code 1975, a part of the Alabama Adoption Code, provides a nearly identical definition of “abandonment.”) Thus, § 26-18-3(1) provides, in the disjunctive, for four different acts that constitute abandonment, any one of which constitutes a ground for the termination of parental rights. Financial support of the child plays no role in two of the four acts constituting abandonment, the first and third. The father therefore fails those two tests, either one of which is sufficient to require a finding that the father has abandoned the child.
In addition, the second type of abandonment identified in the statute is the “withholding from the child, without good cause or excuse, by the parent, of his presence, care, love, protection, maintenance or the opportunity for the display of filial affection.” In this case, the father has not provided his presence, care, love, protection, or the opportunity for the display of filial affection for a period of at least five and one-half years. He did provide some financial “maintenance,” but even this he was forced to provide through involuntary payroll deductions as the result of a paternity action brought against him. I cannot conclude that those payroll deductions are a sufficient basis to conclude that the father did not satisfy the second category of *960 abandonment identified in § 26-18-3(1); nor can I conclude that such payroll deductions come close to performing all “the duties of a parent” that were this father’s responsibility, as contemplated by the fourth category of abandonment identified in the statute.
In sum, based on the facts presented in this case and a comparison of those facts to the four types of abandonment described in § 26-18-3(1), I must conclude that the father’s actions satisfy each of the four categories, any one of which would be a sufficient basis to require the conclusion that the father had abandoned his child.[2]
The trial court reasoned that the mother and her husband had decided after a period of time to “establish their own family and not tell the child that the Husband was a stepfather as opposed to a biological father.” This, according to the trial court, constitutes evidence that “efforts by the biological father would have been rebuffed.”
My response to the foregoing is to ask the question what else are a loving mother and stepfather supposed to do under these circumstances. The biological father had shown absolutely no interest in having anything to do with the child for five and one-half years. What message therefore are we sending to mothers with children whose fathers have abandoned them? How long must such a mother wait before attempting to establish her own home and family and to proceed with her life independent of the biological father? Section 26-18-7(c) provides that four months is presumptively long enough. If not four months, would one year be enough? Two years? In the present case, the evidence is undisputed that for several years the father made no effort to have any involvement in the life of his daughter. I am concerned that by our opinion today this court is advising this mother, and similarly situated mothers, that the State of Alabama expects them to hold a place in their daughter’s or son’s life for a man who has for many years shown absolutely no interest in occupying that place. Such a message invades the parental rights of the custodial parents and extends to a biological father rights and privileges that are far beyond what that father has sought to obtain for himself.
The trial court’s judgment states that the decision of the mother to establish her own family with the daughter and the stepfather is evidence that the biological father’s efforts to establish a relationship with his daughter would have been rebuffed. Perhaps this is correct. Indeed, the very fact of this lawsuit and the position taken here by the mother and the stepfather are evidence that, at least after five and one-half years of providing such a family for the daughter, and after five and one-half years of the biological father’s playing no role in and expressing no desire for a role in the life of his daughter, such efforts would indeed be rebuffed. I see no reason why they should not be rebuffed given the fact that the biological father had long since abandoned his child. Would such efforts have been rebuffed, however, during the first four months of the child’s life, or during the first four months after the paternity of the father was judicially established? During the first year after the father’s paternity was judicially established? The first two or three years? We do not know; to answer these questions requires speculation. The one thing we do *961 know is that the father never made those efforts.
Our law provides that the father’s parental rights should be terminated only in the most egregious of circumstances. I believe the circumstances of this case are more than egregious enough. Indeed, insofar as the actual experience of the child in this case, I am not sure how the biological father’s abandonment of her during the first five and one-half years of her life could be any more complete than it was.
In R.K. v. R.J., 843 So.2d 774 (Ala.Civ.App.2002), this court discussed at length the concept of abandonment and the special opportunity a biological father has for becoming a real father in the life of his child. When a biological parent fails to take advantage of that opportunity, he or she forfeits the special status that the law otherwise provides.
“ “When an unwed father demonstrates a full commitment to the responsibilities of parenthood by “eom[ing] forward to participate in the rearing of his child,” Caban [v. Mohammed], 441 U.S. [380,] 392, [99 S.Ct. 1760, 600 L.Ed.2d 297 (1979)], his interest in personal contact with his child acquires substantial protection under the Due Process Clause. At that point it may be said that he “act[s] as a father toward his children.” Id., at 389, n. 7[, 99 S.Ct. 1760]. But the mere existence of a biological link does not merit equivalent constitutional protection. The actions of judges neither create nor sever genetic bonds. “[T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in ‘promoting] a way of life’ through the instruction of children ... as well as from the fact of blood relationship.” Smith v. Organization of Foster Families for Equality and Reform, 431 U.S. 816, 844[, 97 S.Ct. 2094, 2109-2110, 53 L.Ed.2d 14] (1977) (quoting Wisconsin v. Yoder, 406 U.S. 205, 231-233[, 92 S.Ct. 1526, 32 L.Ed.2d 15] (1972)).’
“Lehr[ v. Robertson], 463 U.S. [248,] 261, 103 S.Ct. 2985 [(1983)](...; footnote omitted in R.K.).
“Conversely, when an unwed father fails to ‘come forward,’ he will not acquire substantial constitutional protection:
“ ‘The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child’s future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child’s development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child’s best interests lie.’
“Lehr, 463 U.S. at 262, 103 S.Ct. 2985 (footnote omitted in R.K.). See also M.V.S. v. V.M.D., 776 So.2d 142, 146 (Ala.Civ.App.1999) (relying on Lehr for the proposition that a biological father must have a ‘substantial relationship’ with a child in order to have a constitutional right to withhold consent to that child’s adoption).
“Here, the unwed father clearly did not step forward when he could have. The courts of this State therefore are under no obligation to accord the father full United States Constitutional protection of his parental rights. In the eyes *962 of federal jurisprudence, providing such protection would be inconsistent with the best interests of the child, given the father’s lack of any substantial relationship with the child.
“The State of Alabama, however, may be free to make a different judgment as to what would be in the best interests of children who have been abandoned by their biological fathers. The State may decide, insofar as state law is concerned, that the physical abandonment of a child by an unwed, biological father (in contrast to such father’s abandonment of adjudicated paternity rights), should not prevent such a father from being on an equal presumptive footing with a fit, custodial mother — and on better footing than all other parties, regardless of their historical relationships with the children — if and when such a father’s paternity is eventually adjudicated. Indeed, Ex parte D.J.[, 645 So.2d 303 (Ala.1994),] appears to do that. There is therefore an unavoidable tension between the holding of Ex parte D.J. and the principles reflected in Lehr and the state authorities other than Ex parte D.J. discussed above.
“Nonetheless, this court, as was the trial court, is bound by the holding of Ex parte D.J. However, that holding is not dispositive in the present case. The paternity of the father in this case did not remain unadjudicated throughout the entire time he continued his forfeiture of the child.
“R.J. was adjudicated as the father of the child in 1997, more than three years before he petitioned for custody. Ex parte D.J. does not foreclose a finding that a man who has been adjudicated to be the father of a child has, by his post-adjudication neglect of a child, voluntarily forfeited his custodial rights. The juvenile court’s conclusion that the father did not abandon the child ‘as a matter of law1 is therefore incorrect as to the period between 1997 and the filing of the father’s July 2000 custody petition.
“Moreover, there was substantial evidence in this case indicating that the father, following his 1997 adjudication as the father of the child, made scarcely any effort to contact the child or the child’s family, and that the father was a complete stranger to the child until the mother found the father in February 2000 and initiated contact with him. Indeed, because there is no substantial evidence to the contrary, we conclude that the father did voluntarily forfeit custody of his child after his 1997 adjudication and that the maternal grandparents accepted custody of the child during this same period and acted on such custody to the manifest interest and welfare of the child. We therefore must reverse the judgment of the juvenile court and remand the cause for that court to determine whether the father met the [Ex parte] McLendon[, 455 So.2d 863 (Ala.1984)] burden of proving that a transfer of custody to him at this juncture would materially promote the best interests of the child.”
R.K. v. R.J., 843 So.2d at 781-83 (footnotes and emphasis omitted; emphasis added).
The abandonment of the child in the present case lasted even longer than the abandonment in K.D.T.J. v. Madison County Department of Human Resources, in which I wrote:
“[T]he constitutional concerns that are likewise reflected in our state-law presumption favoring biological parents are not even raised in the first instance where a father has not stepped forward to assume responsibility for and involvement in the life of his child. In the present case, the record clearly demon *963 strates that the father made no effort and took no initiative to locate the mother, to determine the status of the child, and/or to obtain a paternity test. There is no evidence that he provided emotional or financial support to the mother prior to the birth of the child. For over two and one-half years after the child’s birth, he took no initiative of his own to determine whether he was the father of the child, either through self-help or through the help of a court. In short, he showed no interest in the child or even in finding out if the child was his, despite knowing that there was a ‘strong possibility’ that he was the father. In part because the father had not stepped forward to be a parent to this child, the child was placed by [the Department of Human Resources] in foster care and, over a period of approximately two years, bonded with loving foster parents whom the child considers to be his mother and father according to the testimony of one witness.
“While there is and should be a strong policy presumption favoring the right of a parent to the custody of his or her child, the fundamental principles that inform that presumption and that should be guiding our decisions in this area do not support the extension of that presumption in a case such as this to a father whose only connection with the child is a purely biological one. If we are serious about pursuing the best interests of the children in such cases, I believe we must recognize both the legal and practical effect of a biological father who allows himself to become a stranger to his offspring. See generally Lehr v. Robertson[, 463 U.S. 248 (1983),] and R.K.[ v. R.J., 843 So.2d 774 (Ala.Civ.App.2002)].”
K.D.T.J. v. Madison County Dep’t of Human Res., 867 So.2d 1136, 1149 (Ala.Civ.App.2003) (Murdock, J., concurring in part and dissenting in part).
The second issue presented in this case relates to the trial court’s discussion of the second prong articulated in Ex parte Beasley. The trial court stated that even if the father had abandoned the child, it “must proceed further to determine that all viable alternatives to termination had been considered and should be rejected as not in the best interest of the child.” I agree with this as a statement of the court’s responsibility under the second prong of the test articulated in Ex parte Beasley. See D.M.P., 871 So.2d 77 (plurality opinion). The trial court’s judgment, however, reflects a somewhat different focus.
The trial court’s judgment continues as follows:
“Clearly, the court cannot find, based on the evidence of the knowledge in the family and community, that the child’s parentage will be hidden from her forever and the mother and stepfather admitted that they would have to inform the child of the truth when they felt the time was right. Also, it is clear that the child making the discovery of her parentage without proper preparation will be traumatic and detrimental. Considering the conflicting expert testimony as to when the subject should be broached, the Court cannot find that a professionally assisted learning process toward providing the child with the proof of her parentage is not a viable alternative and such would appear to be in the best interest of the child. Therefore, the court cannot find that termination of parental rights is necessary to, or would produce, a desired result in maintaining the child’s ignorance of her true parentage.
“Likewise, the Court cannot find from the facts and circumstances presented, *964 that it is clearly in the best interest of the child to prevent the eventual establishment of a relationship with her biological father or that visitation between the father and the child in the future would be contrary to the best interest of the child and is not a viable alternative to termination of parental rights when properly approached with proper professional advice and therapy. In other words, the Court does not find that it is in the best interest of the child to terminate the parental rights of the biological father merely to delay the child’s knowledge of the truth or to avoid or delay facing the same in an organized and therapeutic manner, merely to assist the stepfather in his desire to become an adoptive father.”
The issue under the second prong articulated in Ex parte Beasley is not whether, when, or how a child should be informed of his or her biological parentage. In a case such as this, making and carrying out that decision is the mother’s role and responsibility and falls within her fundamental parental right to control the care and custody of her child. If a court decides that not terminating a biological father’s parental rights is in the best interest of the child and, further, decides that visitation between the father and that child would be in the child’s best interest, then the court may, in some cases, find that its “assistance” is needed to effectuate its visitation order and help the parties address the issue of how the child should be informed of his or her parentage.[3] But the task of determining whether, how, and when to inform a child of his or her true parentage is not- the primary focus of the trial court under the second prong of Ex- parte Beasley.
Under the second prong articulated in Ex parte Beasley, a trial court is to determine whether a parental relationship with the biological father, and concomitantly adoption by a third party, is in the best interest of the child. Here, however, the trial court expressly made it clear that it focused on the need to avoid the “traumatic and detrimental” possibility of the child making an unplanned discovery of her parentage and the need for a professionally assisted learning process as a “viable alternative” that would appear to be in the best interest of the child. This focus is reflected throughout the trial court’s analysis of the second Ex parte Beasley prong, including the trial court’s concluding comment that
“the Court does not find that it is in the best interest of the child to terminate the parental rights of the biological father merely to delay the child’s knowledge of the truth or to avoid or delay facing the same in an organized and therapeutic manner, merely to assist the *965 stepfather in his desire to become an adopted father.”
I do not believe that it can reasonably be concluded from the record presented that the purpose for the stepfather’s attempt to adopt the child in this case was “merely to delay the child’s knowledge of the truth or to avoid or delay facing the same in an organized and therapeutic manner.” As the trial court itself stated, the child will learn of her true parentage sooner or later anyway. Rather, the purpose for which the mother and the stepfather sought the adoption at issue was, based on all indications in the record, the same as is the purpose of most prospective adoptive parents — that is, to provide the parental relationship for the child that is in the child’s best interest. Likewise, the task of the trial court under the second prong of Ex parte Beasley is to decide what parental relationship is in the best interest of the child. I cannot conclude that the evidence in this case supports the conclusion that the child’s best interest would be served by refusing to terminate the father’s parental rights and preventing the adoption of the child by her stepfather.
I therefore respectfully dissent.

. The trial court’s findings with regard to the degree of abandonment include such terms as "significant,” "little if any,” or "no substantial”; the testimony, however, made it clear that the father made no efforts whatsoever to establish any relationship with the child until recently. While the trial court also noted the mother’s admission in her testimony that the father may have had reasonable doubt concerning his paternity of the child, that doubt was obviously removed when the child was *958 approximately one year old with the adjudication of the biological father's paternity.

. Furthermore, § 26-18-7(c) provides that
''[i]n any case where the parents have abandoned a child and such abandonment continues for a period of four months next preceding the filing of the petition, such facts shall constitute a rebuttable presumption that the parents are unable or unwilling to act as parents.”

. If, in a given case, the State decides that it is in the child's best interest that the father’s parental rights be terminated, the State certainly has no role in deciding whether, how, or when to inform the child of his or her true parentage. If the State decides that termination is not in the child's best interest, but that visitation with the biological father is also not in the child's best interest, the State again has no role to play in deciding whether, how, or when to inform the child of his or her true parentage. Even if the State decides that termination is not in the child’s best interest and that visitation with the biological father is in the child’s best interest, the issue of how and when to inform the child of his or her true parentage is secondary to the fundamental issue that must first occupy the trial court's attention — whether to terminate and, if not, whether to establish visitation with the biological father. The fact that a child will, sooner or later, learn who his or her biological father is logically leads only to the parenting issue of whether and how to inform the child of such fact before he or she learns of it otherwise, not whether termination of the biological father's parental rights is or is not in the child's best interest.