[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 79 
D.M.P. ("the mother") and M.M. ("the father") appeal from separate judgments of the Shelby Juvenile Court terminating their parental rights to their daughter, M.F.M. The cases were tried together and are based on substantially the same record.
The mother and the father were married in July 1999; the mother gave birth to M.F.M. in March 2000. The mother has an I.Q. of between 57 and 65 and suffers from seizures that, according to her, cause her to lose her memory on occasion. The father has an I.Q. of 69. Expert testimony established that both the mother and father's I.Q. scores are extremely low and correlate with mental retardation.
A few months after M.F.M.'s birth, the father accepted a job driving a truck and moved to Montgomery to accommodate his employment. The mother remained in Shelby County with M.F.M. The mother also had custody of C.M., her 14-month-old *Page 80 
son from a previous marriage. During the father's employment in Montgomery, he visited the mother and children on most weekends and called them on occasion during the week.
At about the same time that the father accepted the Montgomery job, the Department of Human Resources ("DHR") received a report from the mother's neighbor indicating that the children were not being properly fed. DHR contacted a "wrap-around team" to assist the mother with parenting services and to provide her with food for the children. In June 2000, a member of the wrap-around team reported that she had provided the mother with 21 cans of infant formula for M.F.M. and that when she had visited the mother 2 weeks later only 2 or 3 cans of infant formula had been used.
During its investigation into M.F.M.'s care, DHR determined that M.F.M. should have gained one pound to one and one-half pounds during the month of June. Instead, M.F.M. had gained only four ounces. DHR also discovered that the mother failed to take M.F.M. to a scheduled weigh-in and that both M.F.M.'s and C.M.'s weights were in the tenth percentile for their respective ages. Further, C.M. was unable to properly chew his food because the mother had not been feeding him age-appropriate foods. The father admitted that when he accepted his new employment in Montgomery he was aware that the mother had not been properly feeding M.F.M. However, the father stated that his mother had agreed to assist with M.F.M.'s care.
Partly as the result of a family conflict, the mother executed a foster-care agreement in July 2000, pursuant to which she granted DHR temporary custody of M.F.M. and C.M. According to the father, the mother and his stepfather had been having an affair. Shortly after the father discovered the affair, the father and mother separated, the paternal step-grandfather ordered the paternal grandmother to leave their home, and the mother began living with the paternal step-grandfather. The mother lived with the paternal step-grandfather for several months, although she denied having an affair with him.
In August 2000, DHR filed a dependency petition as to M.F.M. Subsequently, M.F.M. was adjudicated to be a "dependent child" as defined in Ala. Code 1975, § 12-15-1(10); the trial court ordered that M.F.M. remain in foster care. In October 2001, DHR filed a petition to terminate the mother's and the father's parental rights as to M.F.M.[1] Before DHR filed its termination petition, the mother and the father had divorced and the mother had married another man, M.P., even though DHR had informed the mother that M.P. was the subject of a child sex-abuse investigation and that her marriage to M.P. would jeopardize DHR's efforts to reunite her with M.F.M. The trial court conducted a four-day trial in December 2001, at which it received ore tenus testimony. A few weeks after the trial, the trial court issued a final judgment terminating the parents' parental rights to M.F.M. and granting permanent custody of M.F.M. to DHR. The parents filed postjudgment motions, and the trial court denied those motions.
The mother and the father have appealed, arguing that DHR failed to present clear and convincing evidence that it made reasonable efforts to rehabilitate them. They also argue that placement of the *Page 81 
child with the paternal grandmother was a "viable alternative" to termination of their parental rights. Finally, they argue that the trial court did not properly consider whether two other individuals were "viable alternatives" to termination because, they argue, the trial court failed to require DHR to perform home studies on those individuals.
When a trial court's decision to terminate parental rights is based on evidence presented ore tenus, we will presume that the judgment is factually correct, and we will reverse the trial court only if the record demonstrates that the decision is unsupported by the evidence and is plainly and palpably wrong. M.H.J. v. State Dep't of Human Res.,785 So.2d 372 (Ala.Civ.App. 2000).
In Ex parte Beasley, 564 So.2d 950 (Ala. 1990), our Supreme Court identified a two-pronged test that must be applied in parental rights termination cases:
 "First, the court must find that there are grounds for the termination of parental rights, including, but not limited to, those specifically set forth in § 26-18-7. Second, after the court has found that there exist grounds to order the termination of parental rights, the court must inquire as to whether all viable alternatives to a termination of parental rights have been considered. . . .
 "Once the court has complied with this two-prong test — that is, once it has determined that the petitioner has met the statutory burden of proof and that, having considered and rejected other alternatives, a termination of parental rights is in the best interest of the child — it can order the termination of parental rights. Such a construction of the Uniform 1984 Child Protection Act clearly comports with the stated purpose for the Act."
564 So.2d at 954-55 (emphasis added).[2] See also Ala. Code 1975, § 12-15-71(a); Ex parte State Dep't of Human Res., 624 So.2d at 589-93 (applying Ex parte Beasley).
The 1984 Child Protection Act, Ala. Code 1975, § 26-18-1 et seq. ("the CPA"), provides, in part, that a court may terminate parental rights
 "[i]f the court finds from clear and convincing evidence, competent, material and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future."
Ala. Code 1975, § 26-18-7(a).
In determining whether the grounds for termination described in the above-quoted portion of § 26-18-7(a) exist, the CPA provides, in part, that "the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
 "(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
 "(2) Emotional illness, mental illness or mental deficiency of the parent . . . of such duration or nature as *Page 82 to render the parent unable to care for needs of the child.
". . . .
 "(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
 "(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed."
Ala. Code 1975, § 26-18-7(a) (emphasis added).
When a child is not in the physical custody of a parent, the trial court must also consider the following:
 "(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
 "(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department . . . and agreed to by the parent.
". . . .
 "(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources . . ., in an administrative review or a judicial review."
Ala. Code 1975, § 26-18-7(b).
Subsections (a) and (b) of § 26-18-7 further provide that the trial court may consider factors other than those set forth in those subsections in determining whether to terminate a parent's parental rights. See, e.g., Brown v. Alabama Dep't of Pensions Sec.,473 So.2d 533, 535 (Ala.Civ.App. 1985) (stating that the CPA "enumerates only some of the many factors this court has long taken into consideration in making determinations concerning the termination of parental rights").
 I.
The father and the mother argue that DHR did not make sufficient efforts to rehabilitate them and to reunify them with M.F.M. In regard to the mother, the trial court, with good reason, characterized the mother's testimony as confusing and conflicting; the court specifically determined that the mother "was either confused or misrepresenting to the Court events that transpired." The mother has a tenth grade education and became pregnant with her first child (not C.M. or M.F.M.) after she was allegedly raped by her uncle. Custody of the mother's first child was awarded to a third party in 1994, and the mother has never regained custody of that child. The mother married C.M.'s father in 1995, but she separated from him a few years later. C.M. was born soon after the mother separated from C.M.'s father. The mother alleged that C.M.'s father had physically abused her and that he had used illegal drugs. The mother and C.M.'s father were divorced in January 1999.
A few months after her divorce from C.M.'s father, the mother married the father; she gave birth to M.F.M. approximately nine months later. As noted, a few months after M.F.M.'s birth, the mother began living with her father-in-law, causing substantial family conflict and physical violence between her and her mother-in-law. Several months later, the mother divorced the father and married M.P., despite DHR's warning that her relationship with M.P. could jeopardize her reunification with M.F.M. because M.P. had allegedly sexually abused one of his children. M.P. also had threatened to kill the mother *Page 83 
and to harm M.F.M. When asked whether it was in M.F.M.'s best interest to live with M.P. in light of his threat to harm M.F.M., the mother responded, "I hadn't thought about that."
DHR's initial efforts to assist the mother failed because the mother had failed to provide M.F.M. with adequate daily nutrition. After the mother had relinquished custody of M.F.M. to DHR, she failed to complete parenting-skills classes. A wrap-around team that attempted to help the mother eventually concluded that she had not progressed in her parenting skills. The mother also missed 12 scheduled weekly visits with M.F.M. in the 7 months before the trial. She also failed to attend a scheduled psychiatric evaluation.
Based on the foregoing, we conclude that the record before us is such that the trial court could reasonably have found by clear and convincing evidence that DHR had made reasonable efforts to rehabilitate the mother and to reunify her with M.F.M. For various reasons, including the mother's mental deficiencies and her poor decision-making, those efforts simply were unsuccessful.
The father also argues that DHR failed to make reasonable efforts to rehabilitate him and to reunify him with M.F.M. Specifically, he argues that DHR did not provide him with wrap-around team services. However, the wrap-around team service provider had requested that the father have an approved home evaluation before it agreed to provide services. Although the father knew that M.F.M. had been placed in foster care in July 2000, his initial home evaluation was not completed until March 2001 because of his failure to cooperate with DHR. Upon evaluating the father's home in March 2001, DHR noted that the home had uncovered light switches, exposed wiring, no fire extinguishers, and no smoke detectors. The father had agreed to address those deficiencies and to contact DHR for a reevaluation of the home. Thereafter, DHR repeatedly asked the father to contact it to schedule a reevaluation of his home. However, he failed to contact DHR for a reevaluation of his home until July 2001, a few days before a scheduled court hearing regarding M.F.M.'s status.
A reevaluation of the father's home was eventually scheduled for August 2001. The father informed DHR that either he or his mother would be at the home for the evaluation. However, when the DHR representative arrived to conduct the evaluation, neither the father nor his mother were at the home. Thereafter, the father failed to schedule another evaluation, despite DHR's request that he do so.
A clinical psychologist testified that the father had extremely low recall abilities, social judgment, common sense, and social maturity. The father had failed to consistently visit M.F.M., missing 8 scheduled visits in the 7 months preceding the trial and being 25 to 40 minutes late for 5 other visits. In regard to the father's move to Montgomery after M.F.M. was born, the trial court found as follows:
 "Illogically, [the father] took a job an hour away and incurred expenses to stay out of town overnight, rather than keeping a job locally earning $1.00 an hour less. He explained that he thought the out-of-town job might be a better career move; however, he made such a move at his daughter's peril. [DHR] records reflect, and [the father] admits, that he knew his newborn daughter was fragile and underweight and he himself had concerns about [the mother's] failure to properly feed [M.F.M.], yet he took a job out of town, returning only on weekends."
Also, the father failed to complete parenting-skills classes and later told DHR *Page 84 
that he did not have time for parenting-skills classes. We also note that, despite having income of approximate $2,000 per month, the father failed to contribute financially to M.F.M.'s care after DHR had obtained temporary custody of the child. Based on the foregoing, we also conclude that the record contains ample evidence from which the trial court could reasonably have found that DHR met its burden of presenting clear and convincing evidence that it had made reasonable efforts to rehabilitate the father and to reunify him with M.F.M. As with the mother, those efforts failed.
 II.
The father and the mother next argue that placing M.F.M. in the custody of the paternal grandmother was a viable alternative to the termination of their parental rights. The paternal grandmother has an I.Q. of 64. She admitted that the father had asked her to assist the mother with feeding M.F.M. in June 2000 because the father had been concerned about M.F.M.'s weight. The paternal grandmother testified that she had worked every other week in June 2000, but that she had stayed with the mother and M.F.M. for several hours every day during her weeks off. She stated that she had not suspected that M.F.M. had not been properly fed in June 2000, even though the father testified that it was obvious that M.F.M. had not gained weight as she should have and DHR's investigation revealed that M.F.M. had not received proper nutrition during the period when the paternal grandmother was allegedly assisting the mother.
In addition, DHR performed a home study on the paternal grandmother's home in January 2001. It had requested that she obtain a smoke detector and a fire extinguisher and that she move cleaning supplies so that they were not within the reach of children. DHR had informed the paternal grandmother that after she had done those few things she should contact DHR so that it could perform a follow-up evaluation to approve her home for wrap-around services. Thereafter, DHR requested that the paternal grandmother schedule a time for reevaluation of her home on several occasions, but she failed to schedule the reevaluation and she admitted that she never addressed the issues that DHR had raised during the first home evaluation.
In March 2001, the paternal grandmother moved to a new home with a paramour. She failed to inform DHR of the move until August 2001, and, thereafter, she failed to schedule a home evaluation for her new home, even though DHR had repeatedly requested that she do so. Further, the paternal grandmother admitted that M.F.M. could not have been placed in her custody at the new home because it only had one bedroom. She also admitted that she had made no plans to obtain a suitable home for receiving custody of M.F.M. Based on the foregoing, we conclude that DHR demonstrated that the paternal grandmother was not a viable alternative-placement resource for M.F.M.
 III.
Finally, the father and the mother argue that the trial court failed to adequately consider whether two individuals — M.D., identified in a trial court order as a "maternal aunt," and F.P., a third party about whom no other information is included in the record — were viable alternatives for the custodial placement of M.F.M. The father and mother complain that the trial court terminated their parental rights without requiring DHR to conduct home studies of M.D. and F.P. *Page 85 
The events made the basis of the father and mother's argument that the trial court failed to adequately consider M.D. and F.P. as viable alternatives to termination began in March 2001, when, following a hearing, the trial court entered an order requiring DHR to conduct home investigations on M.D. and F.P. The only mention in the record of M.D. and F.P. occurs in this trial court order; there is no indication in the record as to how the names of those two individuals came to the attention of the trial court. Nor is there any other information concerning those individuals in the record.
At the trial on its petition, DHR admitted that it had not conducted the home investigations on M.D. and F.P. that had been ordered by the trial court. Casey Sanders, the DHR social worker who had managed the parents' case, did testify, however, that she had requested that both the mother and the father provide her with the names of possible relative-resource placements and that the mother and the father had provided her with no names.
At trial, the parents argued that the paternal grandmother was a viable alternative placement. The trial court elected to conduct a separate hearing on the issue of the viability of the paternal grandmother as a custodial resource. It was at the end of this subsequent hearing at which we find the first indication in the record that the parents urged the trial court to consider placement with M.D. or F.P. as a viable alternative to termination of their parental rights. The record contains no evidence that either M.D. or F.P. had ever visited or seen M.F.M., or that they had any relationship of any nature with M.F.M. The record also contains no evidence indicating that either M.D. or F.P. had ever requested that they be considered as an alternative-placement resource or that they had any desire or willingness to serve in that capacity. The record also contains no evidence indicating that either M.D. or F.P. had ever provided any assistance to the mother, the father, or M.F.M.
The issue presented, therefore, is the true nature and extent of the trial court's obligation to consider "viable alternatives" where DHR has demonstrated that the parents are unfit. Put differently, this case calls on us to address the question of "to what end" must an "alternative" be "viable." Our review of the cases decided by our courts reveals that our articulation of the law with respect to "viable alternatives" has varied from one case to another. The resolution of the issue presented thus requires a review of the history and purpose of our courts' consideration of this issue.
 A.
The requirement that our courts consider "viable alternatives" to termination is not now and never has been, per se, included in our child-welfare statutes. The discussion of viable alternatives in our cases can be traced to the discussion of federal constitutional concerns in Roe v. Conn, 417 F. Supp. 769 (M.D.Ala. 1976).[3]
In Roe, Roe's alleged father "contacted the Montgomery Police Department and *Page 86 
reported that [the mother] might be neglecting . . . Roe, that [the mother] had been evicted from her former residence because she was keeping company with black males, and that she had moved to Highland Village (a black neighborhood) where she was living with a black man."Roe, 417 F. Supp. at 774. The alleged father also contacted the Montgomery County Youth Facility regarding Roe's circumstances and the Youth Facility requested that the police department investigate the mother's living circumstances, particularly whether she was living with someone to whom she was not married. The mother permitted a police officer
 "to enter and inspect her dwelling, which the officer found was a two-bedroom apartment, where [the mother] and [Roe] were living with a black man to whom she was not married. . . . Roe was clothed, clean, and in `fairly good' physical condition with no signs of physical abuse. The home was `relatively clean' and stocked with `adequate food.' Upon completing this inspection, [the officer] left the home and called [the Youth Facility] and reported his findings. He was then instructed . . . to go to the Youth Facility to get a pick-up order. The only facts about [the mother] known to [the Montgomery Family Court Judge] before he issued the pick-up order were that she was unemployed and that she and her child are white and were living with a black man in a black neighborhood. . . . [The judge] concluded that . . . habitation in a black neighborhood could be dangerous for a child because it was his belief that `it was not a healthy thing for a white child to be the only [white] child in a black neighborhood.'"
Roe, 417 F. Supp. at 774-75.
Based upon the police officer's investigation, the Montgomery Family Court issued a pick-up order for Roe and the officer summarily seized Roe as an alleged "neglected child" and took him to a shelter home licensed by the Department of Pensions and Security. In accordance with Title 13, §§ 350(2) and 352(4), Ala. Code 1940 (Recomp. 1958), the mother wasnot provided with prior notice and a hearing before the child was seized from her. Roe, 417 F. Supp. at 773.
One month after Roe was seized, the Montgomery Family Court held a hearing and awarded the alleged father temporary custody of Roe and informed the mother that she had "`the right to petition the court for custody of [Roe] at any future date.'" Id. at 775. The mother filed two petitions for custody of Roe, but both of her petitions were denied and her parental rights were apparently terminated based upon Roe's status as a "neglected child."[4] The alleged father also obtained an ex parte order from the Montgomery Probate Court declaring himself to be Roe's father *Page 87 
and changing Roe's last name to the father's last name.
Based upon the Montgomery Family Court's decisions, the mother and Roe each filed a class action in the federal district court challenging the constitutionality of Alabama's child-neglect law because it allowed the State to deprive a parent of the custody of a child "without a prior hearing where there was no showing of immediate or threatened harm" and because it allowed the State to deprive a parent of custody "because they are living with men (other than relatives or boarders) to whom they are not married." Id. at 773.
Relying on the reasoning employed in Alsager v. District Court of PolkCounty, 406 F. Supp. 10 (S.D.Iowa 1975), aff'd, 545 F.2d 1137 (8th Cir. 1976), and on a "long line of [United States] Supreme Court cases addressed to the constitutional interests at stake where various aspects of family life are threatened," the district court stated that "the Constitution recognizes as fundamental the right of family integrity. This means that in our present case the state's severance of [the mother's] parent-child relationship and [Roe's] child-parent relationship will receive strict judicial scrutiny." Roe, 417 F. Supp. at 777
(citing, in pertinent part, Stanley v. Illinois, 405 U.S. 645 (1972);Prince v. Massachusetts, 321 U.S. 158 (1944); Pierce v. Society ofSisters, 268 U.S. 510 (1925); and Meyer v. Nebraska, 262 U.S. 390
(1923)).
The district court first determined that the summary-seizure provision in the 1940 Code (Recomp. 1958) violated the mother's right to procedural due process under the United States Constitution. Roe,417 F. Supp. at 777. It then addressed the statutory language that permitted a child to be removed from parental custody upon a finding that a child was a "neglected child." Applying a strict-scrutiny analysis,[5] the district court stated, in pertinent part:
 "As discussed supra, the Constitution includes the right to family integrity among the fundamental rights secured to all persons. This right is applied to the States through the Fourteenth Amendment and is accorded strong protection from state interference. States, in the exercise of their inherent police powers, may abrogate such rights only to advance a compelling state interest and pursuant to a narrowly-drawn statute restricted to achieve only the legitimate objective. . . . It is not disputed that the State of Alabama has a legitimate interest in the welfare of children. Minor intrusions into the affairs of the family may be permitted when the State has reason to believe that a child's best interest is at stake. In such cases, various options and alternatives are available to the State to achieve its objective of child protection. One possibility might be a requirement that the parents attend seminars and weekly counselling sessions on child care and the responsibilities of parenthood. Another situation might warrant supervision of the parents by a welfare counselor or the placing of a neutral person — such as an *Page 88 
aunt — in the home to serve as a bridge between the parents and the child. The State's interest, however, would become `compelling' enough to sever entirely the parent-child relationship only when the child is subjected to real physical or emotional harm and less drastic measures would be unavailing.[12]
 "Here, the State offered no assistance to [the mother], who was faced with the troubling predicament of raising a young child without the aid of a husband, nor did it explore the possibility of accomplishing its objective of protecting . . . Roe's welfare by use of alternatives other than termination of custody.
 "The Alabama statute defining `neglected' children sweeps far past the constitutionally permissible range of interference into the sanctity of the family unit. The fact that a home is `improper' in the eyes of the state officials does not necessarily mean that a child in that home is subject to physical or emotional harm.[6]
 ". . . [T]he state's burden is not only to show that the child is being disadvantaged but also to show that the child is being harmed in a real and substantial way. Accordingly, this Court declares Alabama Code [1940 (Recomp. 1958)], Title 13, §§ 350 and 352 unconstitutional.
"_________________
 [12] It must be emphasized that this standard does not apply to all custody proceedings but only those where the State seeks to assume custody. In proceedings where the parties have an arguably equal right to custody, such as pursuant to a divorce, a `best interest of the child' standard is entirely appropriate."
Roe, 417 F. Supp. 779-80 (emphasis added).
In several cases decided after Roe, the Alabama Court of Civil Appeals attempted to distance itself in some respects from the Roe decision. InSmith v. State Department of Pensions Security, 340 So.2d 34
(Ala.Civ.App. 1976), the court stated that Roe[7] addressed only "neglected" children and did not touch upon "dependent" children and that, even if Roe applied to dependent children, this court was not bound by the Roe decision. Smith, 340 So.2d at 37; see also Lovell v. Dep't ofPensions Sec., 356 So.2d 188 (Ala.Civ.App. 1978).
However, in Hunley v. Houston County Department of Pensions Security, 365 So.2d 81 (Ala.Civ.App. 1978), this court stated that "Title 13, § 350 et seq., Code of Ala. 1940, has been rewritten and is now codified as § 12-15-1 et seq., Code of Ala. 1975 [(the `Alabama Juvenile Justice Act')]. The revised code incorporates the suggestions set out in [Roe] with respect to its constitutional validity." Hunley, 365 So.2d at 84 n. 1.[8] *Page 89 
Among other things, the Alabama Juvenile Justice Act, § 12-15-1 et seq., Ala. Code 1975 ("the AJJA"), merged the definitions of "neglected child" and "dependent child" from the 1940 Code (Recomp. 1958) into the definition of "dependent child" in the AJJA. Compare Ala. Code 1975, § 12-15-1(10)d. through i., m., and n., with Ala. Code 1940 (Recomp. 1958), Tit. 13, § 350(1) and (2). However, unlike its predecessor, the AJJA included a provision that expressly authorized a trial court, upon a finding of dependency, to terminate parental rights, but only "[i]n appropriate cases." See Ala. Code 1975, § 12-15-71(a)(5).[9]
In Miller v. Alabama Department of Pensions Security, 374 So.2d 1370
(Ala.Civ.App. 1979), this court, attempting on the one hand to distance itself from Roe, stated:
 "[T]he mother argues the constitutional standard to be applied when a parent-child relationship is terminated is a `harm standard' rather than the `best interests and welfare' standard ordinarily used in child custody cases. For this proposition the mother relies on [Roe].
". . . .
 "We have held that Roe applies only to `neglected' children and not to `dependent' children. . . . We have also said that should Roe be construed to apply to `dependent' children, we would not be bound by that decision."
374 So.2d at 1373-74.
On the other hand, Roe's strict-scrutiny analysis, requiring the use of "less drastic measures" to address the "compelling state interest" in alleviating the "real and substantial harm" of a child remaining in the custody of an unfit parent, did manage to find its way into the analysis employed by the Miller court:
 "In deciding what is in the best interests of a child who is the subject of a custody dispute, the courts of this state consider many factors, among which would be conduct of the parents toward the child, family environment, health of the child, physical and emotional abuse of the child, abandonment of the child, love of and interest in the child by the parents, and activities of the parents that would be detrimental to the safety and welfare of the child. Foremost among the listed factors, especially in a situation where the state is seeking a termination of parental rights, would be less drastic measures than permanent removal of parental custody. For example, a court would certainly consider returning the child to parental custody on a trial basis subject to certain definite conditions being met and subject to supervision by DPS [Department of Pensions and Security] workers or other trained personnel; or temporary custody in a foster home with specific visitation with the child and conduct requirements to be met by parents; or that the parents are to be deprived of custody temporarily pending a correction of deficiencies in the home environment that were having or would have a harmful effect on the child *Page 90 should the child be placed back in the family relationship.
 "In the case at bar it is quite obvious from the record that the use of less drastic measures than permanent deprivation of custody was tried on many occasions and absolutely no cooperation was obtained from the parents. And, this effort by the juvenile court and DPS went on for almost four years.
 "It cannot be seriously contended by the appellant in this case that every effort was not made by the state to rehabilitate her family so that it could again exercise familial rights and responsibilities toward the child in question."
Miller, 374 So.2d at 1374 (citations omitted; emphasis added).
It is important to note that each of the three examples of "less drastic means" outlined in Miller as alternatives to termination were to the end of reunifying the child with its parents — that is, they were alternatives that would allow the parent an opportunity to rehabilitate in the hope of "again exercis[ing] familial rights and responsibilities."[10] Further, despite the court's initial protest that Roe did not govern its decision, it is apparent from the foregoing passage that the court in Miller based its decision to affirm the termination on the fact that the State had pursued alternatives less drastic than termination until it had been demonstrated that further attempts to rehabilitate the parents would be futile. In this regard, it is also important to note that, at the time this court decided Miller, there was (1) no statutory requirement that the State employ the "le[ast] drastic measures" available to remedy a child's dependency and (2) no statutory requirement that DHR make reasonable efforts to reunify a dependent child with its parents before attempting to terminate parental rights.[11]
As noted above, § 12-15-71(a)(5), the only statute at the timeMiller was decided that expressly authorized the termination of parental rights, restricted that authority to "dependent children" in "appropriate case[s]." After making the above-quoted statements, the Miller court made it even clearer, consistent with Roe, that a case in which a child is dependent, see § 12-15-1(10), due to the present unfitness of his parents, ultimately may not be an *Page 91 
"appropriate case" for termination. The State must demonstrate that it has first pursued alternatives to termination that are "viable" in the sense that they will provide the child with a fit custodian while foreseeable rehabilitation of, and reunification with, the parents is attempted:
 "The phrase `in appropriate cases' [in § 12-15-71(a)(5)] is found within the context of a statute which sets forth numerous alternatives for the disposition of a dependent child. We think the presence of these less drastic measures serves to limit and define those instances where the severance of the parent-child relationship may be deemed `appropriate.' As pointed out above, a four year attempt to implement one or more of these less drastic measures in the instant case proved futile."
Miller, 374 So.2d at 1376 (emphasis added).
A case in which it is demonstrated, as it was in Miller, that reunification is not likely within the foreseeable future now falls within the "grounds for termination" prescribed in § 26-18-7(a). Consistent with the constitutional concerns expressed by Roe, § 26-18-7(a) now provides that the court may terminate parental rights,
 "[i]f the court finds from clear and convincing evidence, competent, material and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future."
(Emphasis added.)
While Miller involved a case where it may not have been apparent at the outset that reunification would ultimately prove futile, there obviously are dependency cases where it is clear early on that the parents are unfit and cannot be made fit within the "foreseeable future," or where reunification is otherwise not an appropriate goal. In the latter category are those cases that now fall within statutory provisions adopted since Miller that make reunification unnecessary in certain circumstances. See Ala. Code 1975, § 12-15-65(m) ("Reasonable efforts shall not be required . . . where the parental rights to a sibling have been involuntarily terminated or where a court . . . has determined that a parent has . . . (1) Subjected the child to an aggravated circumstance, including, but not limited to, abandonment, torture, chronic abuse, substance abuse, or sexual abuse. (2) Committed murder or voluntary manslaughter of another child of such parent. (3) Aided or abetted, attempted, conspired, or solicited to commit murder or voluntary manslaughter of another child of such parent. (4) Committed a felony assault which resulted in the serious bodily injury to the child or another child of such parent."); Ala. Code 1975, § 26-18-7(a)(1) (if parents have abandoned the child "proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents").
The need to explore the prospects for returning the child to a normal custodial relationship with his parents necessarily entails an examination of temporary custodial alternatives that will allow for necessary rehabilitation and reunification. In other words, if there is a custodial arrangement that is viable — that is, a custodial arrangement involving a fit custodian who can provide a stable environment meeting the child's physical, financial, and emotional needs pending the *Page 92 
rehabilitation/reunification process[12] — the teaching of Roe andMiller is that this alternative must be pursued. This result is dictated by and consistent with the application of the two prongs of strict-scrutiny analysis ("compelling state interest" and "less drastic measures") and with the State's ultimate concern for the best interests of the child. It is consistent with the latter because of the legal presumption that a child's best interest and welfare are served by remaining in the custody of a fit parent.[13] Also, this result is consistent with the scheme contemplated by Ala. Code 1975, § 12-15-65, § 12-15-71, and § 26-18-7 and with many of our caselaw pronouncements concerning so-called "viable alternatives." See, e.g., Ex parte StateDep't of Human Res., 624 So.2d 589, 592-93 (Ala. 1993) ("[W]hen the State is petitioning to terminate parental rights, the trial court must find from clear and convincing evidence that the child is dependent and . . .the court must determine whether all viable alternatives to terminationhave been explored." (emphasis added)); Ex parte Ogle, 516 So.2d 243, 244
(Ala. 1987) (noting that a schizophrenic parent was making progress towards rehabilitation, but was not yet capable of assuming custody of the child, and explaining that "[b]efore parental rights may be terminated, all viable alternatives to termination of those rights must be examined to ensure that there is no less drastic measure available");Moore v. State Dep't of Pensions Sec., 470 So.2d 1269, 1270
(Ala.Civ.App. 1985) ("If dependency is found, the court must then find that there exists no viable alternative to termination of the parent's custodial rights." (citing Glover v. Alabama Dep't of Pensions Sec.,401 So.2d 786 (Ala.Civ.App. 1981) (emphasis added)); see also M.H. v.Calhoun County Dep't of Human Res., [Ms. 2010721, Oct. 18, 2002]848 So.2d 1011, 1013 (Ala.Civ.App. 2002) (the trial court must "determine that there exists no alternative to termination" (emphasis added));M.H.J. v. State Dep't of Human Res., 785 So.2d 372 (Ala.Civ.App. 2000) (same); W.F. v. State Dep't of Human Res., 704 So.2d 483 (Ala.Civ.App. 1997) (same); L.A.G. v. State Dep't of Human Res., 681 So.2d 596, 598
(Ala.Civ.App. 1996) ("the court must consider and reject all alternatives to termination of parental rights").
Conversely, where it is demonstrated that the parents are not capable of being rehabilitated or that the "conduct or condition" of the parents that makes them unfit to retain custody of their children "is unlikely to change in the foreseeable future" or where, as explained above, reunification is otherwise not an appropriate goal, obviously no alternative can be considered viable to the end of returning the child to a normal custodial relationship with his or her parent. The State's failure, therefore, to pursue some alternative to termination *Page 93 
that might exist in such a case would not necessarily[14] be fatal to its petition for termination of a parent's rights.[15] This understanding of viable alternatives likewise has been well recognized in our cases. For example, in Handley v. State Department of Pensions Security, 455 So.2d 887 (Ala.Civ.App. 1984), this court stated:
 "[The Department of Pensions and Security] has diligently sought to aid the mother toward rehabilitation and establishment of a home and environment suitable for the children. Except for a brief period of four months, all effort was fruitless. The end result of the four months was the return to filth and depravity. It seems evident that there is no viable alternative but to terminate parental rights so that permanent planning may be made to serve the best interest of the children."
Handley, 455 So.2d at 888; see also, e.g., J.B. v. Jefferson County Dep'tof Human Res., [Ms. 2010469, June 30, 2003] 869 So.2d 475, 483
(Ala.Civ.App. 2003) (plurality opinion) (holding that attempts to rehabilitate the parents were unnecessary because the mother had been convicted of voluntary manslaughter in the death of the child's sibling and the father had abandoned the child); In re Shivers, 440 So.2d 1081,1083-84 (Ala.Civ.App. 1983) ("The parents . . . assert that the trialcourt erred in not requiring [the Department of Pensions and Security] toprovide evidence of alternative custody plans for the three children. Suchevidence is not required. . . . Although we are not bound by the decision in Roe . . ., the record clearly shows that the due process requirements enumerated there have been met. Several alternatives including counseling, temporary custody and assistance were attempted before the Shiverses' rights were terminated."); In re Redmon, 460 So.2d 1317, 1320
(Ala.Civ.App. 1984) (based on two years of failed attempts to implement less drastic measures, the parent was considered "permanent[ly] incompetent").
As previously noted, in Ex parte Beasley, the Alabama Supreme Court expressly adopted a "two-prong" state-law test for use in termination-of-parental-rights cases. The first of those prongs require that, before termination can occur, there must be "grounds for termination," as discussed above. As stated in Ex parte Beasley, "[f]irst, the court must find that there are grounds for the termination of parental rights, including, but not limited to, those specifically set forth in § 26-18-7." 564 So.2d at 954.
By referencing § 26-18-7, the Ex parte Beasley Court made it clear that the "grounds-for-termination" prong is satisfied when the parents are irremediably "unable or unwilling" to serve as fit parents or where the parents' disqualifying "conduct or condition is unlikely to change in the foreseeable future" (or when circumstances exist so that reunification is not an appropriate goal, as discussed above). This encompasses, therefore, those cases discussed above where the State has already satisfied the requirement of pursuing viable alternatives to termination but, *Page 94 
because rehabilitation and reunification are not likely within the foreseeable future, such alternatives have proven to be futile. Once one of those "grounds for termination" have been proven by clear and convincing evidence, the State is in compliance with the constitutional due-process requirements discussed in Santosky v. Kramer, 455 U.S. 745,760 (1982),[16] and the custodial presumption in favor of the parent no longer is applicable:
 "Victory by the State [in a termination-of-parental-rights case] not only makes termination of parental rights possible; it entails a judicial determination that the parents are unfit to raise their own children.
 ". . . After the state has established parental unfitness . . . the court may assume . . . that the interests of the child and the natural parents do diverge. See Fam Ct. Act § 631 (judge shall make his order `solely on the basis of the best interests of the child,' and thus has no obligation to consider the natural parents' rights in selecting dispositional alternatives). But until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship."
Santosky, 455 U.S. at 760 (emphasis added; footnote omitted).
In other words, once "the interests of the child and the natural parents . . . diverge" because of irremediable parental unfitness, the rationale for the legal presumption that custody in the natural parent is in the best interest of the child no longer exists. At that juncture, the State may proceed, unaffected by a parental presumption, to determine simply what disposition of the child would then be in his or her best interest. The possibility of some custodial arrangement that would be a suitable alternative to the termination of parental rights no longer constitutes an absolute bar to termination. As discussed below, however, the State may still consider such alternatives in determining what disposition is in the best interest of the child.
In short, so long as reunification with the parents is a foreseeable likelihood, the State has no choice but to consider and pursue all viable alternatives to such termination. Once "grounds for termination" exist, however, reunification by definition is no longer a "foreseeable" alternative, the constitutional and state-law presumption in favor of the natural parents is lost, the "interests of the child and the natural parents . . . diverge," and the only remaining consideration is the direct question, unencumbered by a parental presumption, of what is in the child's "best interest."
Consistent with this understanding, we note that the statutes at issue in Santosky provided that a determination of unfitness was to be made only after the State had *Page 95 
made efforts to reunify the child with the parents, where appropriate.See N.Y. Fam. Ct. Act, § 614.1 and § 632(a). The statutes also provided that, after a parent had been determined to be unfit, the trial courtcould terminate the parent's parental rights, or it could enter a suspended judgment giving the parent up to one year to meet additional court imposed conditions. See N.Y. Fam. Ct. Act, § 631, § 633, and § 634. However, the choice of remedy was to be based solely on the bestinterest of the child. See N.Y. Fam. Ct. Act, § 631.
Not unlike the New York statutory scheme, Alabama's statutes nowhere include any requirement that, upon a finding that the parents are irremediably unfit (or that for other reasons reunification is not appropriate), the State must terminate parental rights. In such circumstances, the ultimate question will remain: What is in the best interest of the child? Accordingly, the first sentence of § 26-18-7(a) provides only that when the conditions outlined therein are satisfied, the court "may" terminate the parental rights of the parents. Similarly, § 12-15-71(a) provides that if a child is found to be "dependent" the court "may" choose any one of a number of listed alternatives, reserving for "appropriate cases" the alternative of termination. See § 12-15-71(a)(5). At this juncture, a case would still not be an "appropriate case" for termination if, after considering its alternatives, the court determines that termination is not in fact in the best interest of the child.[17]
This is consistent with the manner in which the Ex parte Beasley Court articulated a second "prong" of this State's termination-of-parental-rights law:
 "[A]fter the court has found that there exist grounds to order the termination of parental rights, the court must inquire as to whether all viable alternatives to a termination of parental rights have been considered. . . .
 ". . . [T]hat is, once [the court] has determined that the petitioner has met the statutory burden of proof and that, having considered and rejected other alternatives, a termination of parental rights is in the best interest of the child — [the court] can order the termination of parental rights."
Ex parte Beasley, 564 So.2d at 954-55 (emphasis added).
This understanding of the second prong in Ex parte Beasley is consistent with the pronouncements of our courts in numerous cases. See,e.g., In re Sanders, 420 So.2d 790, 791 (Ala.Civ.App. 1982) ("[I]n seeking permanent termination of a parent's right, the existence of [no] viable alternative to better serve the future welfare of the children should be established." (emphasis added)); In re Shivers, 440 So.2d 1081,1083-84 (Ala.Civ.App. 1983) (noting that several alternatives to termination were *Page 96 
attempted unsuccessfully, and holding that, therefore, "[a]ll that [the Department of Pensions and Security] was required to show was that terminating the parents' rights was in the children's best interest" (emphasis added)); M.H. v. E.F.E., 630 So.2d 452, 454-55 (Ala.Civ.App. 1992) ("no viable alternative existed that would better serve the bestinterests of the child" (emphasis added)); Glover, 401 So.2d at 788 ("We consider important that the State, in seeking permanent termination of parental rights, as compared to temporary custody of a dependent child, establish not only the permanent incompetency and unsuitability of the parent by clear and convincing evidence, but that it present a viablealternative to better serve the future welfare of the children." (emphasis added)); see also M.H.S. v. State Dep't of Human Res.,636 So.2d 419, 421 (Ala.Civ.App. 1994) ("the court must consider and reject all other viable alternatives to termination of parental rights so that it can conclude that the termination is in the child's best interest"); H.M.W. v. Mobile County Dep't of Human Resources,631 So.2d 1049, 1050 (Ala.Civ.App. 1993) (same).
 B.
Applying the foregoing understanding of our precedents and statutes to the present case, we must conclude that the record supports the trial court's conclusion that the parents are unable or unwilling to serve as fit custodians for M.F.M. and that reunification for purposes of a normal parent-child custodial arrangement is not "foreseeable." An alternative custodial arrangement no longer need be pursued in order to allow the parents to rehabilitate; rehabilitation has been shown to be not "foreseeable." The fact that the record contains two names of possible placement alternatives therefore is irrelevant with respect to the "grounds-for-termination" phase of this case. Accordingly, we turn our attention to the second prong of Ex parte Beasley and the question, in the context of a direct inquiry into the child's best interests, whether the trial court adequately "considered" M.D. and F.P. as permanent placements.
In this case, the trial court held a review hearing in March 2001 and issued an order that required DHR to conduct home investigations on two individuals identified only by their names and the fact that one of them was an aunt of the child. Approximately seven months later, DHR filed the petition to terminate the parents' parental rights. At the trial on that petition, DHR admitted that it had not conducted home investigations on M.D. and F.P. However, the DHR social worker who had managed the parents' cases also testified that she had requested that both the mother and the father provide her with the names of relatives who might be alternative placements, but that neither had provided her with any names.
At trial, the parents focused their argument as to viable alternatives on the paternal grandmother. The court specially set a separate hearing regarding whether the paternal grandmother was a viable alternative. It was at the end of that hearing, after the court had taken testimony from the paternal grandmother, that the record first reflects a contention by the mother and the father that DHR should conduct home studies on M.D. and F.P. The trial court, however, proceeded to determine, without the benefit of such home studies, that termination of parental rights was in M.F.M.'s best interests.
Importantly, there is no indication in the record regarding how the names of M.D. and F.P. came to the trial court's attention or why the trial court decided to order DHR to investigate those individuals *Page 97 
in March 2001.[18] Nor is there any evidence indicating that either M.D. or F.P. ever visited M.F.M. or that they had any relationship whatsoever with M.F.M. There was no evidence indicating that M.D. or F.P. had requested that they be considered as alternative-placement resources, no evidence that the parents had brought M.D. or F.P. to the trial court's attention as alternative-placement resources, and no evidence that M.D. or F.P. had ever assisted the mother, the father, or M.F.M. in any way. Moreover, there was no showing whatsoever that either M.D. or F.P. would be a fit custodian for the child, much less that such a placement would be in the child's best interest.
Ultimately, therefore, the argument in favor of reversing the trial court's judgment terminating parental rights comes down to the fact that the record contains the names of two individuals who may or may not be fit custodians for the child. We are provided essentially no information about those individuals. We have an admission by DHR that it did not perform home studies on those two individuals, followed by an order for the termination of parental rights entered by the same trial court that, for reasons known to that trial court but not to this court, ordered those home studies in the first place.[19] Given the deference to be accorded to a trial court's judgment in a termination-of-parental-rights case such as this, we cannot say that the trial court was plainly and palpably wrong to conclude that termination of the parties' parental rights was in M.F.M.'s best interest based on the record presented.
The judgment of the trial court is therefore due to be affirmed.
AFFIRMED.
CRAWLEY, J., concurs.
YATES, P.J., and THOMPSON and PITTMAN, JJ., concur in the result.
[1] The record indicates that DHR attempted to reunify C.M. with his father, but it does not disclose the ultimate disposition of C.M.
[2] Ex parte Beasley involved a petition by one parent to terminate the parental rights of the other parent. The Supreme Court stated in Ex parteBeasley, however, that when a nonparent is the petitioner, there also must be a threshold showing of dependency. 564 So.2d at 954.
[3] Roe addressed the application of Ala. Code 1940 (Recomp. 1958), Tit. 13, § 350 et seq., the predecessor to Ala. Code 1975, § 12-15-1 et seq. While the 1940 Code (Recomp. 1958) did not expressly state that a juvenile court could "terminate" a parent's parental rights, it provided that the juvenile court could award "permanent custody" of a "neglected child" or "dependent child" to the Department of Pensions and Security,see Ala. Code 1940 (Recomp. 1958), Tit. 13, §§ 350, 351, and 361. In Smithv. State Dep't of Pensions Security, 340 So.2d 34 (Ala.Civ.App. 1976), this court construed the authority to award "permanent custody" as the authority to terminate parental rights.
[4] Like a "dependent child" in our current child-welfare statutes,see Ala. Code 1975, § 12-15-1(10), the concept of a "neglected child" in the 1940 Code (Recomp. 1958) did not necessarily entail an irremediable or permanent unfitness on the part of the parent. In pertinent part, Tit. 13, § 350(2), Ala. Code 1940 (Recomp. 1958), defined a "neglected child" as "any child, who, while under sixteen years of age . . . whose home, by reason of neglect, cruelty, or depravity, on the part of his parent or parents, . . . is an unfit and improper place for such child."Compare Ala. Code 1975, § 12-15-1(10)d. (defining a "dependent child," in pertinent part, as one "[w]hose home, by reason of neglect, cruelty, or depravity on the part of the parent [or] parents . . . is an unfit and improper place for the child"). Title 13, § 350(4), Ala. Code 1940 (Recomp. 1958), further provided, in pertinent part, that a "neglected child" "shall be subject to the guardianship of the state and entitled to its care and protection."
[5] See generally L.B.S. v. L.M.S., 826 So.2d 178, 188 (Ala.Civ.App. 2002) (Murdock, J., concurring in the judgment of reversal only) (discussing dual requirements under strict-scrutiny analysis that, in order to justify government interference with the fundamental right of parents to the care, custody, and control of their children, the State must have a "compelling state interest" and the State's interference must be "narrowly tailored to the protection of the compelling state interest").
[6] It may be noted that the language which the Roe court found constitutionally offensive did not appear in the 1940 Code (Recomp. 1958), and does not appear in our current statutes, in isolation. See
note 4, supra (discussing both the definition of a "neglected child" under Ala. Code 1940 (Recomp. 1958), Tit. 13, § 350(2), and the definition of a "dependent child" in § 12-15-1(10)d., Ala. Code 1975). Based upon the facts discussed in Roe, it is rather obvious that there was not sufficient evidence for the Montgomery Family Court to have concluded that Roe was a "neglected child" as that term was defined in the 1940 Code (Recomp. 1958). The evidence certainly falls short of what is now required in termination cases under the CPA and the Alabama Juvenile Justice Act. See Ala. Code 1975, § 12-15-65, § 26-18-7.
[7] Smith incorrectly cites the name of the Roe case as "Wombles v.Cohn." See Smith, 340 So.2d at 37.
[8] Hunley actually involved the application of Title 13, Ala. Code 1940 (Recomp. 1958), rather than the Alabama Juvenile Justice Act ("the AJJA"). The AJJA formed part of the Judicial Article Implementation Act, which was approved on October 10, 1975. The effective date of the AJJA, however, was the subject of some confusion. See Ex parte Ward,540 So.2d 1350 (Ala. 1988).
[9] Section 12-15-71(a) was the only part of the AJJA that specifically referenced termination of parental rights, and it was the only statute referencing termination of parental rights before the enactment of the CPA in 1984. As originally enacted, § 12-15-65(f), Ala. Code 1975, did not contain a specific reference to the "termination of parental rights"; that language was added in 1990. See Ala. Acts 1990, Act No. 90-674.
[10] See also J.B. v. Jefferson County Dep't of Human Res., [Ms. 2010469, June 30, 2003] 869 So.2d 475 (Ala.Civ.App. 2003) (plurality opinion with two judges agreeing with the opinion and three judges concurring in the result). To allow a reasonable time for the rehabilitation/reunification process to proceed, there must of course be a viable custodial alternative for the care of the child in the interim. If there is such a viable custodial alternative — that is, a viable arrangement whereby the child will receive the care he or she needs while the parents attempt to rehabilitate themselves — Roe held that such alternative must be pursued in place of the termination of parental rights, as a less drastic means of preventing the child from remaining in the custody of unfit parents. Not only are Miller and subsequent state cases (discussed infra) consistent with this requirement, the CPA, which was adopted in 1984, now contemplates that a child will eventually be reunited with parents whose "conduct or condition . . . is such as to render them unable to properly care for the child" at the present time, but whose conduct or condition is likely "to change in the foreseeable future." Ala. Code 1975, § 26-18-7(a).
[11] The CPA, with its reference to "reasonable efforts . . . toward the rehabilitation of the parents," see Ala. Code 1975, § 26-18-7(a)(6), was enacted in 1984, well after Miller was decided. As originally enacted, Ala. Code 1975, § 12-15-65 did not contain the current subsections (g) and (m), which discuss DHR's obligation to make reasonable efforts to preserve and reunify families under most circumstances. Subsection (g) was added in 1995, see Ala. Acts 1995, Act No. 95-545, and subsection (m) was added in 1998. See Ala. Acts 1998, Act No. 98-372.
[12] Obviously, in most cases where reunification is a reasonable prospect within the "foreseeable future" there will be a viable placement alternative that will allow the necessary time for the rehabilitation/reunification process to be accomplished.
[13] "The prima facie right of a natural parent to the custody of his or her child, as against the right of custody in a nonparent, is grounded in the common law concept that this primary parental right of custody is
in the best interest and welfare of the child as a matter of law." Exparte Mathews, 428 So.2d 58, 59 (Ala. 1983). "The law devolves the custody of infant children upon their parents, not so much upon the ground of natural right in the latter, as because the interests of the children, and the good of the public, will, as a general rule, be thereby promoted. It is a fair presumption, that so long as children are under the control of their parents, they will be treated with affection, and their education and morals will be duly cared for." Striplin v. Ware, 36 Ala. 87,89 (1860) (quoted with approval in Ex parte D.J., 645 So.2d 303 (Ala. 1994)).
[14] See discussion, infra, of the "second prong" in Ex parte Beasley
and the obligation of trial courts to "consider" alternatives to termination that might be in the "best interests" of a child.
[15] If this understanding were not correct (that is, if a termination could not occur whenever there exists some family resource or other alternative custodial arrangement, irrespective of the irremediability of an unfit parent), a fit custodial parent could never successfully seek the termination of the other parent's parental rights. See generally
Ala. Code 1975, § 26-18-5(a); Ex parte Johnson, 474 So.2d 715 (Ala. 1985) (concluding that a parent could petition to terminate the other parent's parental rights under the AJJA, even before the enactment of the CPA)
[16] In Santosky, the Supreme Court held that due process required the use of at least a "clear and convincing" evidence standard at the "factfinding stage" of a termination proceeding, in part because, until the State proves parental unfitness, "the interests of the child and his natural parents coincide to favor use of error-reducing procedures."Santosky, 455 U.S. at 761. The Supreme Court also stated:
 "The State's interest in finding the child an alternative permanent home arises only `when it is clear that the natural parent cannot or will not provide a normal family home for the child.' Soc. Serv. Law § 384-b.1.(a)(iv) (emphasis added). At the factfinding, that goal is served by procedures that promote an accurate determination of whether the natural parents can and will provide a normal home."
455 U.S. at 767.
[17] For example, if, notwithstanding the unfitness of a parent, there remains a significant emotional bond between a child and an unfit parent, and it has been demonstrated that some alternative-placement resource would allow the child to visit periodically with the unfit parent so as to reap the benefit of partially preserving that relationship without incurring the harm of the child being raised on a day-to-day basis by an unfit parent, the court would be required to weigh the advantage of that arrangement against the advantage of termination and placement for adoption with permanent fit parents, and to decide which of these alternatives would be in the child's best interest. See also,e.g., Ex parte Brooks, 513 So.2d 614, 617 (Ala. 1987), overruled on other grounds by Ex parte Beasley, 564 So.2d 950 (Ala. 1990) (refusing to terminate a father's parental rights because it would not have been in the best interest of the child, even though both the father and the mother had requested termination of the father's parental rights and the father had abandoned the child).
[18] "It is the appellant's responsibility to ensure that the record on appeal contains sufficient evidence to justify a reversal." J.E.J. v.W.I., [Ms. 2010151, Nov. 8, 2002] 851 So.2d 76, 81 (Ala.Civ.App. 2002).
[19] In this regard, we also note that a trial court has the inherent authority to "interpret, implement, [and] enforce" its judgments. E.g.,Holley v. Holley, 829 So.2d 759, 761 (Ala.Civ.App. 2002).